# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

FILED
DEC 14 2018
CLERK, U.S....
ALEXA...

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) | Case No. 1:18-SW-753 |
| 1907 WINTERTHUR LANE #PH3 | ) | |
| RESTON, VA 20191 | ) | UNDER SEAL |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (Property to be Searched)

located in the ____Eastern____ District of ____Virginia____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B  (Property to be Seized)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute and distribution of controlled substances |
| 21 U.S.C. § 846 | Conspiracy to commit such offenses |
| 18 U.S.C. § 924(c)(1)(A) | Possession of a firearm during and in relation to a drug trafficking |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

AUSA Jonathan L. Fahey /SAUSA Brianna Edgar

Christopher M. Ray, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/14/18 2:50 pm

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A ("TARGET LOCATION")

*Property to be Searched*

**11907 Winterthur Lane, Apartment #PH3, Reston, VA 20191**

11907 Winterthur Lane, Apartment #PH3 in Reston, Virginia is described as a multi-family, red brick, multi-story apartment building. The apartment building has a clear glass main exterior entry door with the numbers "11907" in white labeled above the door. Apartment #PH3 is on the top level (Penthouse), has a tan metal door with silver hardware and a silver knocker in the middle of the door with "PH3" engraved on the knocker.

## **ATTACHMENT B**

*Property to be Seized,*

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), conspiracy to commit such offense, in violation of 21 U.S.C. § 846, and possession of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to:

1. Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2. Items used in the manufacture or cooking of heroin and cocaine, including precursor chemicals, chemistry guides, glassware and flasks, which is evidence of the TARGET OFFENSES.

3. Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

4. Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers; personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

5. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

6. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

7. Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

8. United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

9. Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

10. Cellular telephones, cameras, computers, laptops, iPads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

11. Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES; and

12. Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

IN THE MATTER OF THE SEARCH OF: )
)
11907 WINTERTHUR LANE #PH3 )
RESTON, VA 20191 )

UNDER SEAL

Case Number: 1:18-SW-753

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your affiant, Christopher M. Ray, Special Agent with the Federal Bureau of Investigation (hereinafter "FBI"), Washington Field Office (hereinafter "WFO"), Washington, D.C. (hereinafter "affiant"), being duly sworn, deposes, and states as follows:

**I.      AFFIANT BACKGROUND, EXPERIENCE, AND KNOWLEDGE**

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I have been a Special Agent with the FBI since March 2008. Since October 2008, I have been assigned to the FBI's Washington Field Office Safe Streets Task Force, which conducts investigations relating to, among other things, firearms offenses, violent crimes, and narcotics violations. I have prior law enforcement experience as a Public Safety Officer and Detective with the Highland Park Department of Public Safety, Highland Park, Texas, from June 2000 to March 2008. Since 2008, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, and narcotics, white-collar crimes, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the

laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen registers and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

     3. Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that traffickers use to disguise conversations about their narcotics activities. From my training and experience, I have learned, among other things, that narcotics traffickers frequently use cellular telephones to further their illegal activities in the belief that, by so doing, they can avoid detection and thwart the efforts of law enforcement. Cellular telephones also enable coconspirators to remain in constant or ready communication with one another without restricting either party to a particular geographic location, thus hampering surveillance by law enforcement authorities. Furthermore, narcotics traffickers usually do not expressly refer to cocaine, phencyclidine (PCP), or other controlled substances by name, and when they do so, it is most often by mistake. Instead, they routinely refer to drugs and drug quantities — and also quantities of cash — by using code words and/or seemingly innocuous words or phrases in an effort to conceal the true nature of their illegal activities and thwart detection by law enforcement. Narcotics traffickers also frequently have access to several cellular telephones and telephone numbers, and they periodically use newly acquired cellular telephones and telephone numbers, or frequently change cellular telephones and telephone numbers, to avoid detection while attempting to thwart

apprehension by law enforcement. In order to avoid law enforcement detection, these cellular telephones are often prepaid cellular telephones that are often not registered or subscribed in the purchaser's or primary user's name and are instead often registered in a false name and/or to a false address.

4. Based on my knowledge, training, experience and participation in numerous other investigations involving cocaine base, powder cocaine, heroin, marijuana, and other controlled dangerous substances, I also know that:

(a) Narcotics traffickers keep narcotics, narcotics-related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds and storage lockers. In addition, in a conspiracy involving the distribution and possession with intent to distribute cocaine base, powder cocaine, heroin, or marijuana, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade. For example, small and large plastic baggies are the packaging material of choice for many narcotics; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into cocaine base, or to mix and dilute heroin, and transport it discreetly thereafter.

(b) It is also common for narcotics traffickers to distribute from specific locations other than their own residences, to include stash houses, the residences of family members and associates, both witting and unwitting, and other locations where trusted associates of the trafficker are allowed access, in order to protect the cache of drugs, as well as the drug proceeds. Such locations provide security for the trafficker, and it is a known location where

customers go to obtain drugs.

 (c) Drug traffickers often use and retain firearms and other weapons to protect themselves, as well as to secure their cache of narcotics. Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted associates, often also store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits, and ownership papers.

 (d) Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances, and contact information for associates and coconspirators in the narcotics trade. This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. These items are generally maintained and retained for long periods of time in the drug traffickers' residences or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard

drives, including, but not limited to, iPods and external storage drives; and the media to store information, including diskettes, tapes or data storage devices.

(e) Individuals involved in narcotics trafficking often conceal within their residences, the residences of family members, friends and associates, the places of operation of the drug distribution activity such as stash houses or safe houses, or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard, and more importantly conceal, such proceeds of their drug trafficking.

(f) Individuals involved in narcotics trafficking often use narcotics trafficking proceeds to further their enterprise, including laundering such money into legitimate purchases, such as homes, vehicles, etc.

## II. REQUESTED SEARCH WARRANTS

5. As part of my current assignment, I and others have been investigating OMAR ELBAKKOUSH, who has been distributing firearms and narcotics in the District of Columbia, the District of Maryland, and the Eastern District of Virginia.

6. I submit, pursuant to the facts set forth in this Affidavit, that there is probable cause to believe that evidence, fruits, or instrumentalities of violations of possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); conspiracy to commit such offenses, in violation of 21 U.S.C. § 846; and possession of a firearm

5

during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A), will be found at the TARGET LOCATION, as set forth more fully in the Attachments A and B, incorporated herein by reference. The TARGET LOCATION is 11907 Winterthur Lane, Apartment #PH3, Reston, VA 20191.

## Background of Investigation

7. In July of 2018, agents associated with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), and the Metropolitan Police Department ("MPD") began investigating ELBAKKOUSH for possible criminal offenses involving the illegal sale of firearms and narcotics. In addition to using court-authorized GPS-tracking search warrants, court-authorized vehicle tracking devices, pen registers, and other investigatory techniques, the agents also utilized an undercover special agent ("UC") to further the investigation.

## UC Controlled Purchases with ELBAKKOUSH

8. On August 6, 2018, a UC with the ATF engaged in a controlled purchase with ELBAKKOUSH. Specifically, the UC—who had been previously introduced to ELBAKKOUSH weeks before—told ELBAKKOUSH that he was interested in purchasing marijuana and firearms from ELBAKKOUSH. The UC communicated with ELBAKKOUSH via text message. ELBAKKOUSH indicated that he could provide the UC with a firearm with a magazine, an extended magazine, and an attached silencer, in exchange for $1,400. Additionally, ELBAKKOUSH offered to provide the UC with different flavors of "gas," a.k.a. marijuana, in exchange for $1,600 to $1,800. After several text message conversations regarding the type of firearm being sold as well as the prices for the different guns and parts, the two finally agreed to meet on August 6, 2018. On that date, after additional negotiation over the prices, the two met. At

the request of ELBAKKOUSH, the UC traveled to the Home Depot parking lot located at 901 Rhode Island Avenue, Northeast, Washington, D.C. At approximately 6:58 p.m., ELBAKKOUSH arrived in the parking lot and entered the UC's unmarked vehicle. ELBAKKOUSH, who had a backpack on his person, placed the backpack on the front passenger floorboard in front of his feet, and pulled out: one clear vacuum sealed plastic bag containing half a kilogram of green plant-like substance (which ELBAKKOUSH identified as lemon tree flavored marijuana), one unloaded Mack 11 9 mm handgun, one extended magazine, and one regular magazine. ELBAKKOUSH explained that his firearms source forgot to provide him the silencer previously discussed and that ELBAKKOUSH would bring the silencer to the next firearms transaction that he conducted with the UC. In exchange for the marijuana, the firearm, and its accessories, the UC gave ELBAKKOUSH a total of $3,000 U.S. Currency. ELBAKKOUSH exited the vehicle and left the area on foot.

9. Approximately two weeks later, on August 20, 2018, the same UC conducted another controlled purchase with ELBAKKOUSH, at the same location. After the August 6, 2018 buy, ELBAKKOUSH and the UC continued conversing via text message about the future purchase of additional narcotics and firearms. ELBAKKOUSH texted the UC several photographs of firearms he was looking to sell, including a fully automatic pistol. ELBAKKOUSH explained that he was not sure how long his gun supplier would hold onto the firearms before ELBAKKOUSH had to sell them, so ELBAKKOUSH would keep the UC updated as to when they could meet and conduct another transaction. In the lead-up to August 20, 2018, ELBAKKOUSH and the UC texted each other and negotiated over the type of firearms, the price of firearms, the price of marijuana, and the logistics of any future transaction. After much discussion, the two agreed to meet on August 20, 2018. On that date, at approximately 7 p.m., the UC drove to the parking lot at 901

Rhode Island Avenue Northeast and parked. ELBAKKOUSH entered the UC's vehicle, this time holding a big black duffle bag. Once inside of the vehicle, ELBAKKOUSH pulled out: one pound of "Pineapple" marijuana, one pound of "Venom OG" marijuana, one plastic shopping bag full of various ammunition, one silencer, one Sig Sauer pistol with an extended magazine, a Draco AK-47 pistol with a magazine, and one AR-15 rifle with multiple magazines. In exchange, the UC gave ELBAKKOUSH $7,600 in U.S. currency.

10. Over the next few months, the UC continued conversing with ELBAKKOUSH. This time, however, the conversation shifted from the purchase of marijuana and firearms to the purchase of heroin and firearms. Specifically, the UC inquired about purchasing 125 grams of heroin from ELBAKKOUSH. ELBAKKOUSH explained that his heroin supplier had completely pure heroin, so much so that the fumes associated with the heroin would cause individuals to vomit. ELBAKKOUSH encouraged the UC to use cutting agents to dilute the good-quality heroin, in order to make a future profit.

11. On November 1, 2018, ELBAKKOUSH and the UC met in order to conduct a transaction. After some initial phone and text conversations, the two agreed to meet at the Wendy's parking lot, located at 4250 Nannie Helen Burroughs Avenue Northeast, Washington, D.C. At approximately 2:58 p.m., the UC arrived at the parking lot, and observed ELBAKKOUSH standing next to a silver Nissan 4-door sedan. ELBAKKOUSH entered the UC's vehicle. ELBAKKOUSH explained that he was waiting for the heroin to arrive within five minutes from his supplier, but that he had the firearm they had discussed inside of his vehicle. ELBAKKOUSH retrieved the firearm, returned to the UC's vehicle, and gave the firearm to the UC in exchange for $700 in pre-recorded funds. The UC continued to wait for the heroin, but because it was taking too long, the

UC told ELBAKKOUSH that he would leave. At approximately 3:30 p.m., the UC left the parking lot without the heroin.

12. Minutes later, ELBAKKOUSH called the UC back. ELBAKKOUSH explained that his heroin supplier had finally delivered the heroin to him, and he apologized for the long wait. The UC returned back to the parking lot at 4:31 p.m., and ELBAKKOUSH provided the UC with approximately 131 grams of heroin in exchange for $10,800 in pre-recorded funds. The heroin was later field tested and came back positive for the presence of opiates.

13. On November 29, 2018, ELBAKKOUSH and the UC met again in order to conduct another transaction, similar to the November 1, 2018 transaction. After some initial phone and text conversations, the two agreed to meet at the parking lot located at 1535 Alabama Avenue Southeast, Washington, D.C. 20032. At approximately 2:55 p.m., ELBAKKOUSH exited a black Mercedes sedan and retrieved a small black duffle bag from the trunk of the Mercedes. ELBAKKOUSH then walked to the UC's vehicle and sat down in the front passenger seat. ELBAKKOUSH immediately insisted that the UC move his vehicle to another location in the parking lot, because he had concerns that law enforcement was present in the area. ELBAKKOUSH nevertheless provided the UC a clear plastic baggie filled with large chunks of suspected heroin, as well as two revolvers and one Glock pistol. In exchange, the UC gave ELBAKKOUSH $10,300 in pre-recorded funds. The heroin was later field tested and came back positive for the presence of opiates. It weighed approximately 129 grams.

14. The following day, November 30, 2018, ELBAKKOUSH and the UC spoke over the telephone. ELBAKKOUSH explained that he was suspicious yesterday because of the presence of law enforcement in the parking lot where they had conducted the transaction and no longer wanted to use that parking lot for transactions. ELBAKKOUSH explained that if he were to get in

trouble with law enforcement, he vowed to remain silent and would let his lawyer do the talking for him. ELBAKKOUSH indicated that his supplier remained interested in conducting future transactions.

15.  To summarize, between August 6, 2018 and November 29, 2018, ELBAKKOUSH personally sold eight firearms, approximately 1.5 kilograms of marijuana, approximately 260 grams of heroin, several firearms magazines, and other firearms accessories, to an undercover federal agent. All of the transactions were either audio or video-recorded and surveilled by other federal agents. All of the funds provided to ELBAKKOUSH were pre-recorded cashier funds. Moreover, all of the text messages exchanged between the two—using a cell phone app that intentionally deletes messages after a period of time—were, if available, photographed. The Defendant was previously convicted of Felony Distribution of Marijuana (one-half ounce to five pounds) in Fairfax County, Virginia on May 31, 2016, which is a crime that carries with it possible imprisonment of more than one year.

### Identification of TARGET LOCATION

16.  Prior to the UC controlled purchase on November 29, 2018, ELBAKKOUSH told the UC that he was in the process of moving to a new apartment. Using court-authorized geo-location data ("GPS pings"), law enforcement was able to identify the proximity of ELBAKKOUSH's new residence at the TARGET LOCATION. Starting on December 1, 2018, GPS pings showed that ELBAKKOUSH was routinely "pinging" in the vicinity of the Winterthur Apartments in Reston, VA, which law enforcement believed to be the new apartment he previously told the UC he was moving into. On December 6, 2018, in an attempt to identify ELBAKKOUSH's new residence, law enforcement conducted surveillance at the Winterthur Apartments. On that day, surveillance units observed a white 1998 Toyota Camry bearing Virginia license plate

VYZ7209, a known vehicle used by ELBAKKOUSH, parked in front of the TARGET LOCATION.[1]

17. On the same day, law enforcement issued an Administrative Subpoena to the Winterthur Apartments Leasing Office, requesting a list of the tenants and their respective addresses at the apartment complex. Subsequently, agents were provided the requested information and were able to confirm that ELBAKKOUSH signed a one-year lease for the TARGET LOCATION that began on December 1, 2018. From December 1, 2018 to present, GPS pings have shown that ELBAKKOUSH is routinely staying at the TARGET LOCATION and I believe that the TARGET LOCATION is ELBAKKOUSH's new permanent residence.

18. ELBAKKOUSH's rental application for the TARGET LOCATION lists him as "self-employed" with an annual salary of $24,000. The rental application also lists the girlfriend of ELBAKKOUSH as a lessee and shows her annual income as $35,000. Coincidentally, ELBAKKOUSH also lists additional income of $1,200 per week (or $4,800 a month) from a company called JetpackDC. I know JetpackDC to be an illegal online marijuana dispensary in the District of Columbia. According to my investigation, JetpackDC is not a licensed marijuana dispensary, but nevertheless traffics between $80,000 to $100,000 in illegal sales every month. My investigation led to the arrest of an individual named Amir Gibreel (18-cr-328) (RC) as the ringleader of JetpackDC. On October 30, 2018, I executed a search warrant on Gibreel's residence and stash house (both located in D.C.) and found one firearm, over 80 pounds of marijuana, and approximately $35,000 in cash.

---

[1] This vehicle is registered to Sabah Raougui at 3242 Holly Berry Court, Falls Church, VA 22042. Law enforcement believes that Raougui is ELBAKKOUSH's mother. Additionally, ELBAKKOUSH was observed driving this vehicle prior to the UC controlled purchase on November 29, 2018.

## CONCLUSION

38. Based on the foregoing, I submit that there is probable cause to believe that evidence and instrumentalities of the crimes described herein and as set forth more fully in Attachment B to each warrant application, incorporated herein by reference, are contained or secreted within the confines of the TARGET LOCATION, as described more fully in Attachment A. It is also respectfully requested that this Court issue an order sealing, until execution of the warrant, all papers submitted in support of these warrants application, including the applications and search warrants. I believe that sealing this document is necessary because the warrants are relevant to an ongoing investigation and public disclosure of the documents could result in the destruction of evidence and evasion of law enforcement by the targets. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Christopher M. Ray, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 14 day of December, 2018.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

13

## ATTACHMENT A ("TARGET LOCATION")

*Property to be Searched*

### 11907 Winterthur Lane, Apartment #PH3, Reston, VA 20191

11907 Winterthur Lane, Apartment #PH3 in Reston, Virginia is described as a multi-family, red brick, multi-story apartment building. The apartment building has a clear glass main exterior entry door with the numbers "11907" in white labeled above the door. Apartment #PH3 is on the top level (Penthouse), has a tan metal door with silver hardware and a silver knocker in the middle of the door with "PH3" engraved on the knocker.

## **ATTACHMENT B**

*Property to be Seized*

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), conspiracy to commit such offense, in violation of 21 U.S.C. § 846, and possession of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) (collectively, the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to:

1. Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2. Items used in the manufacture or cooking of heroin and cocaine, including precursor chemicals, chemistry guides, glassware and flasks, which is evidence of the TARGET OFFENSES.

3. Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

4. Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

5. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

6. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

7. Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

8. United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

9. Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

10. Cellular telephones, cameras, computers, laptops, iPads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

11. Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES; and

12. Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.